IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ANDREW SIMPKINS, | ) | |
| | ) | |
| Petitioner, | ) | CASE NO. 3:11-0123 |
| | ) | JUDGE HAYNES |
| v. | ) | |
| | ) | |
| CHERRY LINDAMOOD, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM**

Petitioner, Andrew Simpkins, filed this pro se action under 28 U.S.C. § 2254 seeking to set aside his state conviction of attempted first degree murder. After a review of the petition, the Court appointed the Federal Public Defender to represent Petitioner. In his amended petition,[1] Petitioner claims are: (1) that the State lacked jurisdiction to prosecute him because the underlying indictment was fatally defective for failing to set the elements of the offense, as required by the Due Process Clause of the Fifth and Fourteenth Amendments; and (2) that his trial counsel rendered ineffective assistance by failing challenge that indictment. The Respondent answered the petition and concedes that some of Petitioner's claims were properly exhausted under U.S.C. § 2254(b) (Docket Entry No. 26, Answer at 2), but that other claims are

---

[1] Rule 15 of the Federal Rules of Civil Procedure applies in habeas action. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supersede the pro se petition and the claims therein. Unless adopted and supported by a legal memorandum with analysis, those claims to be waived. In his motion for summary judgment, Petitioner sought judgment in "his pending claims" (Docket Entry No. 30 at 1), but briefed only his two claims related to the State indictment.

1

procedurally defaulted, id. at 30-33, 34-37 specifically, his ineffective assistance of counsel claim.

Before the Court is the Petitioner's motion for summary judgment (Docket Entry No. 30), contending that his due process claim, based upon the flawed state indictment justifies the issuance of the writ. In response, the Respondent asserts the State indictment was legally sufficient and that Petitioner was informed of the State's theory to prepare a defense. The Respondent also asserts that the state courts' reasonably rejected Petitioner's claim about his counsel's failure to challenge the indictment for its failure to include the words premeditation. Petitioner filed a reply describing the absence of any factual disputes in his claims that warrant habeas relief.

## A. Procedural History

After a trial, a jury convicted Petitioner of attempted first degree murder and possession of a prohibited weapon for which the trial court sentenced him to twenty-five (25) years. State v. Simpkins, No. M2001-01737-CCA-R3-CD, 2002 WL 1885182, at *1 (Tenn. Ct. Crim. App. Aug. 15, 2002). On direct appeal, the Tennessee Court of Criminal Appeals affirmed his convictions and sentence. Id. On December 23, 2002, the Tennessee Supreme Court denied his application for further review. Id.

Petitioner then filed a petition for the state writ of habeas corpus challenging the legal sufficiency of the indictment. Simpkins v. State, No. M2008-00195-CCA-R3-HC, 2008 WL 2901614, at *1 (Tenn. Ct. Crim. App. July 25, 2008). Based upon state law precedents, the trial and appellate courts denied Petitioner's claims. Id. at 2.

Petitioner then filed a second petition for a writ of habeas corpus in the state court with claims of ineffective assistance of counsel and an illegal sentence. The trial court denied the

petition and the Tennessee Court of Criminal Appeals affirmed. State v. Simpkins, No. M2008-02607-CCA-R3-PC, 2010 WL 1221411, at *1 (Tenn. Ct. Crim. App. March 30, 2010). On August 26, 2010, the Tennessee Supreme Court denied further review. Id.

### B. Findings of State Record

### 1. Findings of Fact

For this motion, the key facts are that on January 19, 1999, Jesse Lopez's doorbell rang, and when he opened the door, Lopez was shot in the fact, but survived. Lopez could not identify the shooter. Id. at *2-3. Petitioner's girlfriend told him that Lopez and two of his friends had raped her at a party. Id. at *1. The State's proof was Petitioner purchased a shot-gun, sawed-off the barrel, staked-out Lopez, went to Lopez's house, rang the doorbell, and as soon as Lopez answered, Petitioner shot him. Id. at *1-4.

The state appellate court's specific factual findings[2] on the Petitioner's guilt were as follows:

> The Defendant, an infantry soldier in the United States Army, met his girlfriend, Genevieve Soler, at a fair in June 1998. In July, the two began dating. Shortly thereafter, Soler told the Defendant that her ex-boyfriend, Jesse Lopez, along with two of his friends, had raped her at a party. Soler told the Defendant that she was intoxicated and did not remember much of the alleged rape. Over the next few months, the Defendant talked with Soler and several others about the rape and his plans to exact revenge on the alleged rapists.
>
> Soler testified that after she told the Defendant about being raped by Lopez, the Defendant talked about the rape almost every day and repeatedly talked about hurting or "taking care" of Lopez. The Defendant also asked Soler where Lopez lived.

---

[2] State appellate court opinion findings can constitute factual findings in a habeas action. Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(e).

3

Janet Hern, a close friend of Soler, testified that shortly after the Defendant and Soler began dating, the Defendant started asking her questions about Lopez, including how he got home from school and if she knew when he would be home alone. The Defendant told Hern to get Lopez outside, and he would "take care of the rest." Hern claimed that the Defendant called her so often to discuss Lopez that she began avoiding his calls. The Defendant told Hern that Lopez "should not live" for raping his girlfriend.

Joshua Caleb Sisson, the Defendant's roommate at Fort Campbell from 1998 to 1999, testified that during a road trip to Memphis, the Defendant told Sisson that his girlfriend had been raped by her ex-boyfriend. The Defendant appeared angry and disgusted and said that people who raped other people should be killed. Throughout the trip, the Defendant continued to talk about the rape.

Elan Banks, a former roommate of the Defendant, testified that the Defendant talked about the alleged rape every day and told Banks that he planned to kill the men who raped Soler. On several occasions, the Defendant told Banks that he planned to go to Lopez's home, ring the doorbell, and shoot. The Defendant asked Banks to help him get a gun so that he could shoot the alleged rapists. He also asked Banks to ride by Lopez's house with him.

On January 15, 1999, four days before Lopez was shot, the Defendant purchased a 12-gauge shotgun at Wal-Mart. The sales associate at Wal-Mart completed a firearms transaction report for a New England Farms Model SB1-101 shotgun. The associate obtained purchase approval through the Tennessee Bureau of Investigation (TBI) instant check at 4:57 p.m. The serial number for the Defendant's gun was NM363294.

The Defendant then went to a nearby retail store, Grandpa's, to purchase shells for the shotgun. A systems analyst at Grandpa's was able to match a receipt recovered during the investigation with the date and item purchased. The receipt indicated that 12-gauge game load, number six bird shot, was purchased on January 15, 1999 at 5:28 p.m. The analyst testified that Grandpa's is located down the street from the Wal-Mart store where the Defendant purchased the gun. She also testified that Grandpa's is an Ace Hardware dealer and uses Ace Hardware sacks.

Two days later, two of the Defendant's friends, Elliott Tso and Kee Blackwater, visited the Defendant's room. At that time, they saw the Defendant sawing on a shotgun. Blackwater heard the Defendant ask Tso to help him stake out Lopez's house.

The day before the shooting, the Defendant displayed a sawed-off shotgun to at least two people. Soler testified that the Defendant produced a short, black shotgun and said he intended to go to Lopez's house and scare him with it. Banks

4

testified that, while riding in the Defendant's car, the Defendant pulled a sawed-off shotgun from under the seat and placed it in Banks' lap.

On January 19, 1999, the day of the shooting, the Defendant finished work around 4:30 p.m. Afterwards, he was required to attend a "GI Party," which is essentially a cleaning session at the barracks. Around 6:00 p.m., Soler talked with the Defendant on the phone. The Defendant asked Soler to call Lopez's house to see if he was home. While talking to the Defendant, Soler heard him tell his superiors that he had to leave the GI party to take Soler to the hospital, although Soler did not actually need to go to the hospital. Because Soler was unwilling to call Lopez herself, she asked her friend, Johanna Paschall, to make the call. Paschall called Lopez and asked for "Rick." She then called Soler and said that she made the call, but did not know who answered the phone. Soler called the Defendant and told him that Lopez was not home, but that his parents were.

Jesse Lopez recalled receiving a phone call around 7:00 p.m. the night of the shooting. Lopez testified that the caller asked for someone who did not live at the Lopez residence. Less than half an hour later, at 7:22 p.m., the doorbell rang at the Lopez's house. Expecting a visit from his friend, Michael, Lopez ran past his mother to answer the door. As he opened the door, he was shot in the face. Lopez did not see who was at the door and did not remember being shot.

Around 8:00 p.m., Soler and the Defendant met at Paschall's house. Soler later told detectives that the Defendant was acting strangely. She reported that he was unusually quiet and asked Soler to hug him.

After meeting with Soler, the Defendant returned to the barracks to see Elliott Tso. Tso testified that the Defendant arrived around 10:00 p.m. The Defendant told Tso, "I got one." He said that he knocked on the door, shot the first person that answered, and ran. The Defendant told Tso that the person he shot was Lopez. He asked Tso if he would take the gun, but Tso refused. The Defendant then told Tso that he had put the shotgun shells in the back of Tso's truck. Tso found and removed the shells from an Ace Hardware sack. Tso testified that he and the Defendant were close friends and that he was unsure of what to do. Tso decided to turn the shells over to detectives and to allow them to search his truck.

Investigators testified that they interviewed the Defendant the day after the shooting. Initially, the Defendant told detectives that he did not own a shotgun. He also said that during the time the shooting occurred, he had gone to a shoppette on the Kentucky side of the Fort Campbell post to purchase a sandwich, chips, a snack cake, and a drink. After reviewing the sales receipts from this particular shoppette, detectives were unable to corroborate the Defendant's purchases. They also became aware of his gun purchase. In a second interview, the Defendant admitted to purchasing the shotgun, but claimed it was stolen from his car on the same day it was purchased. The Defendant did not report the gun

5

stolen. During this interview, the Defendant maintained that he had gone to the shoppette at the time of the shooting.

The Clarksville Police Department, along with investigators from the United States Army Criminal Investigation Command (CID), conducted a search of the barracks and the surrounding areas. Underneath a military conics, a steel storage container resembling a dumpster, located twenty-three to thirty feet from the building in which the Defendant lived, investigators found a bag containing a shotgun. The gun had been wrapped in felt similar to that found in a military-issue blanket. The shotgun was a New England Farms firearm 12-gauge, the same type the Defendant purchased at Wal-Mart only days before the shooting, with a partial serial number of NM 36. The remainder of the serial number had been destroyed. However, the TBI was able to restore seven of the eight digits of the serial number on the shotgun. With the exception of the single missing digit, the restored number matched the serial number on the Defendant's shotgun. Inside the Defendant's room, investigators found a notepad with the names of the three alleged rapists. Lopez's phone number was written beside his name. From Elliott Tso's truck, detectives recovered a plastic Ace Hardware sack, similar to those used at Grandpa's, containing the receipt for shotgun shells purchased at Grandpa's. They also discovered a silver hacksaw similar to the one Tso and Blackwater saw the Defendant using to saw on the shotgun. Tso led investigators to the actual shells that the Defendant left in his truck. The TBI concluded that shot and wadding recovered from the crime scene was consistent with the size and weight specification of the shells recovered from Elliott Tso's truck.

While incarcerated, the Defendant told another inmate, Kenneth Buckler, about the shooting. According to Buckler, the Defendant claimed that he shot someone in the face because the victim and some other people had raped the Defendant's girlfriend. The Defendant told Buckler that he was angry, that he had planned the shooting, and that he had staked out the victim. He said that he had sawed off a shotgun, gone to the victim's home, knocked on the door, and shot as soon as the victim answered. The Defendant told Buckler that he cleaned off the gun, wrapped it in a poncho liner, and placed it under the barracks.

Simpkins, 2002 WL 1885182, at *1, *2, *3, *4.

As pertinent to the Petitioner's motion for summary judgment, the first count in the State's indictment charged Petitioner with attempted first degree murder, and reads as follows:

COUNT I:

That on or about the 19th day of January, 1999, and in the State and County aforesaid, ANDREW B. **SIMPKINS unlawfully and feloniously, did knowingly or intentionally act with intent to complete a course of action or**

6

**cause a result that would constitute the offense of First Degree Murder, in violation of TCA 39-13-202** under the circumstances surrounding the conduct as said defendant believed them to be, and said conduct constituted substantial step toward the commission of said offense, to-wit: **by going to the residence of Jesse Lopez and shooting him in the face when the said victim answered the door, in violation of TCA 39-12-101(a)(3) and against the peace and dignity of the State of Tennessee.**

(Docket Entry No. 27-1, Addendum No. 1 at 4) (emphasis added).

In its closing argument, the prosecutor told the jury, "the Judge is going to tell you [that] we are going to have to prove that the Defendant acted intentionally and with premeditation." (Docket Entry No. 27-4, Notice, Addendum No. 4, Transcript at 13). The remainder of the state prosecutor's closing argument focused on Petitioner's mental state: "revenge is a dish best served cold," emphasizing Petitioner's planning and lack of passion. Id. at 13-18. Petitioner's trial counsel's principal argument was that Petitioner was not the shooter, id. at 18-31 and did not address the issue of premeditation or Petitioner's mental state. Id.

At trial, the state trial court instructed jury that premeditation was an element of the offense of first degree murder and the essential elements were: (1) that the Defendant unlawfully killed the alleged victim: (2) that the Defendant acted intentionally; and (3) that the killing was premeditated. (Docket Entry No. 27-16, Notice, Addendum No. 16, Petitioner Post-conviction Br. at 10).

### B. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to the dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412. In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme] Court's decisions but unreasonably applies it to the facts of the particular case." Id. at 694. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law

8

erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts <u>we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it.</u> See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added).

The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2000).

### 1. The Sufficiency of the Indictment

Petitioner contends that because "[p]remeditation" was not alleged in the indictment, the indictment was fatally defective because the State did not give him fair notice of the charges

9

against him. (Docket Entry No. 30, Petitioner's motion to dismiss at 7). Petitioner contends that because scienter is a necessary element of first degree murder, "[i]t is well established that an indictment is defective if it fails to allege elements of scienter that are expressly contained in the statute that describes the offense," (quoting and citing United States v. Pupo, 841 F.2d 1235, 1239 (4th Cir. 1988)) (citing Hagner v. United States, 285 U.S. 427 (1932)). Petitioner contends that a State's failure to meet those requirements is ground for habeas relief. See Valentine v. Konteh, 395 F.3d 626, 631 (6th Cir. 2005).

On Petitioner's direct appeal, the Tennessee appellate court found that Petitioner's indictment met the minimum constitutional and statutory requirements under Tennessee law:

> In Ruff v. State, 978 S.W.2d 95 (Tenn.1998) the Court held that "where the constitutional and statutory requirements outlined in [State v.] Hill [, 954 S.W.2d 725 (Tenn.1997) ] are met, an indictment which cites the pertinent statute and uses its language will be sufficient to support a conviction." Id. at 100.
>
> In Hill, the Court cited the constitutional and statutory requirements of an indictment as follows:
>
> ... an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is requirement, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy.
>
> Id. at 727.
>
> The form of an indictment is subject to statutory prescription also. Tennessee Code Annotated section 40-13-202 (1990) provides that an indictment must:
>
> State the facts constituting the offense in ordinary and concise language, without prolixity or repetition in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.
>
> Id.
>
> Count 1 of the indictment, charging attempted first degree murder, does not specifically contain the word "premeditation." However, it does allege that

petitioner acted intentionally or knowingly to commit "[f]irst [d]egree [m]urder, in violation of [Tennessee Code Annotated section] 39-13-202," and that statute specifically includes the element of premeditation in the crime of first degree murder.

Simpkins, 2008 WL 2901614, at *2. Petitioner notes that the Tennessee appellate failed to mention that Tenn. Code Ann. § 39-13-202 also includes felony murder and murder with a destructive device.

The Fifth Amendment requires an indictment to contain all the elements of the charged offense so as to provide a defendant with adequate issue notice of the charges and precluding any double jeopardy. Russell v. United States, 369 U.S. 749, 763-64 (1962). "In an indictment upon a statute, it is not sufficient to set forth the offense in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." Id. at 765 (quoting United States v. Carll, 105 U.S. 611, 612 (1881)).

Moreover, "no principle of procedural due process is more clearly established than that notice of the specific charge . . . [is] among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." Cole v. Arkansas, 333 U.S. 196, 201 (1948). "The due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense." Madden v. Tate, No. 85-3061, 1987 WL 44909, at *3 (6th Cir. 1987). "[T]he indictment must include every essential element of an offense, or else the indictment is invalid; and mere reference to the applicable statute does not cure the defect." United States v. Kingrea, 573 F.3d 186, 191 (4th Cir. 2009) (citing United States v. Daniels, 973 F.2d 272, 274 (4th Cir. 1992)).

11

At the time of the offense and Petitioner's trial, Tennessee law defined premeditation as follows:

> 'Premeditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and *'deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. 'Deliberation' is present if the thinking, i.e., the 'premeditation,' is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a 'careful weighing' of the proposed decision.*

Brown, 836 S.W.2d 530, 540-41 (quoting C. Torcia, *Wharton's Criminal Law* § 140 (14th ed.1979) (emphasis in original)); see also State v. Gentry, 881 S.W.2d 1 (Tenn. Crim. App. 1993). See also Tenn. Code Ann. 39-13-202(a)(1).

Here, the indictment charges Petitioner "**did knowingly or intentionally act with intent to complete a course of action or cause a result that would constitute the offense of First Degree Murder, in violation of TCA 39-13-202 ... by going to the residence of Jesse Lopez and shooting him in the face when the said victim answered the door.**" (Docket Entry No. 27 at 4) (emphasis added). These factual allegations are consistent with premeditation.

Petitioner's trial counsel was aware of the State's theory of an intentional killing as to prepare a defense. The Court deems noteworthy that in his second state habeas appeal, the Tennessee appellate court found that Petitioner's trial counsel was aware of the premeditation theory.

> Trial Counsel further testified that he did not recall objecting to the indictment in the petitioner's case or informing the court that the indictment did not include the premeditation element. **Trial Counsel stated that, from the indictment, he learned that the state was alleging that the petitioner intentionally killed the victim. He agreed that the indictment did not contain any allegation of premeditation and he did not recall whether he told the petitioner that premeditation was an element of first degree murder.** Trial Counsel stated that

12

he did not make a motion to amend or dismiss the indictment. Trial Counsel further stated that the indictment did not specifically say that the petitioner used a gun, and it referred only 'to a short barrel length of less than eighteen inches and that the weapon was less than twenty-six inches overall.'

Simpkins, 2010 WL 1221411, at *5.

Given that Tennessee law on the legal sufficiency of an indictment is in complete accord with the federal constitutional standards, actual wording of the indictment, and Petitioner's trial counsel's awareness of the state's premeditation theory, the Court concludes that the state courts could reasonably conclude that Petitioner's indictment was legally sufficient to give notice of the charges and to protect Petitioner against any double jeopardy for trial on any other related charges.

## 2. Ineffective Assistance of Counsel Claims

Petitioner next contends that his trial and appellate counsel were ineffective for failing to challenge his defective indictment at trial or on appeal. Petitioner's actual claims about his counsel in the state court were as follows:

> Based on the evidence presented at the hearing, the post-conviction court denied post-conviction relief. The post-conviction court found that the petitioner's counsel did not commit any unprofessional error, and there was "no reasonable probability of such error undermining confidence in the verdict." The court commented that "trial defense counsel did a very effective job of defending petitioner at the jury trial of this matter." The petitioner has appealed the decision of the post-conviction court.

Id. at *11.

In any event, on Petitioner's post-conviction appeal, the Tennessee Court of Criminal Appeal made the following findings of fact about Petitioner's trial counsel:

> Assistant District Attorney General Helen Young testified that she prosecuted the petitioner's case. She recalled that the petitioner's first defense attorney [FN1], Pre-Trial Counsel, approached her and asked if she would make a settlement offer to the petitioner. General Young said that she "related to him that any offer that

13

[she] made would be predicated upon the [petitioner] giving enough evidence to charge and convict his girlfriend and that the only consideration that [she] would probably be willing to give for that is [to] agree to cap it at fifteen to twenty...." Pre-Trial Counsel rejected her offer, and neither she nor the district attorney's office offered another settlement. On cross-examination, General Young testified that it was her opinion that the petitioner's girlfriend manipulated the petitioner into committing the shooting and that was why she wanted information about the girlfriend.

> FN1. The petitioner had several attorney's during his case. Throughout this opinion, we will refer to them as Appointed Counsel, Pre-Trial Counsel, Trial Counsel, and Post-Conviction Counsel.

Trial Counsel testified that he represented the petitioner in the first degree murder case that was the subject of the post-conviction hearing. Before his representation, the petitioner had other attorneys at the circuit court and general sessions court levels. Trial Counsel stated that he contacted the petitioner's previous counsel and obtained the petitioner's file. Trial Counsel could not recall if the petitioner explained the difficulties he had with his previous counsel or had filed a complaint against his previous counsel with the Board of Professional Responsibility. Trial Counsel remembered discussing settlement offers with the petitioner and said the petitioner told him that the state made an offer at the general sessions level. Trial Counsel did not recall the substance of the offer. He also did not recall General Young formally offering the petitioner, as a settlement, the chance to plead guilty to second degree murder in exchange for his testimony against his girlfriend.

\* \* \*

Regarding the jury instructions, Trial Counsel stated that he remembered that "there were instructions that ... instructed all the way from attempted first-degree murder down to assault." Trial Counsel did not recall making an objection to that charge. Trial Counsel stated that he did not believe the petitioner mentioned that he was taking Larium before the trial. Trial Counsel never heard the petitioner admit that he committed the crimes and "it appeared to [him] that [the petitioner] was trying to assert factual innocence up until after he was convicted." Trial Counsel stated that he did not recall whether he and the petitioner discussed filing a motion for speedy trial or if the petitioner asked him to file the motion. Trial Counsel further stated that he reviewed the petitioner's court file but did not recall whether the petitioner wrote letters to the court clerk. When shown a letter that the petitioner had written to the clerk, Trial Counsel said that he remembered seeing the letter, though he did not remember whether the petitioner asked for a speedy trial.

Trial Counsel testified that he did not object to the trial court's application of enhancement factors to the petitioner. He said that he did not object because he did not "believe there was any case law that said that the sentencing scheme at the time violated confrontation, so [he] didn't make those objections." After the court appointed the petitioner's post-conviction counsel, Trial Counsel contacted the petitioner's new counsel to inform him about the State v. Schiefelbein<sup>FN2</sup> case. Trial Counsel also informed Post-Conviction Counsel that, under that case, the petitioner may have a potential post-conviction claim for Trial Counsel's failure to object to the enhancement factors.

> FN2. See State v. Schiefelbein, 230 S.W.3d 88, 150 (Tenn.Crim.App.2007) (holding that the trial court's use of statutory enhancement factors to increase sentence length to the maximum range violated the 6th Amendment right to trial by jury).

**Trial Counsel further testified that he did not recall objecting to the indictment in the petitioner's case or informing the court that the indictment did not include the premeditation element. Trial Counsel stated that, from the indictment, he learned that the state was alleging that the petitioner intentionally killed the victim. He agreed that the indictment did not contain any allegation of premeditation and he did not recall whether he told the petitioner that premeditation was an element of first degree murder. Trial Counsel stated that he did not make a motion to amend or dismiss the indictment. Trial Counsel further stated that the indictment did not specifically say that the petitioner used a gun, and it referred only "to a short barrel length of less than eighteen inches and that the weapon was less than twenty-six inches overall."**

On cross-examination, Trial Counsel testified that he did not have a settlement offer to present to the petitioner. He further testified that if he had an offer, he would have informed the petitioner. He stated that when he spoke to the petitioner about his case, "[the petitioner] tried to provide an alibi." Trial Counsel stated that Ms. Solar was an alibi witness, but he could not recall whether she testified that the petitioner had discussed hurting the victim. Trial Counsel also stated that Ms. Solar's friend, Janet Hearn, was an alibi witness. Trial Counsel did not remember if Ms. Hearn testified that the petitioner requested that she get the victim outside and that she avoided the petitioner's calls because he called her so much. Trial Counsel recalled Joshua Sisson's testimony that the petitioner said that "something needed to be done about the victim and some other people allegedly raping his girlfriend." He also recalled the name of Mr. Banks, who was a witness at trial, but he did not recall Mr. Bank's testimony that the petitioner talked about killing the people responsible for raping his girlfriend daily. Trial Counsel remembered testimony that petitioner "planned to go to [the victim's] home, ring the bell and then shoot." He also remembered testimony that the petitioner asked

Banks to ride by the victim's home, but he could not recall if it was Banks who gave that testimony.

Trial Counsel remembered that a "jailhouse informant," Mr. Buckler, testified that the petitioner "was angry, planned the shooting, stake[d] out the victim, got the sawed off shotgun, went to his home, knocked on the door and as soon as the victim answered the door, [the petitioner] shot him." However, Trial Counsel testified that Mr. Buckler's testimony seemed to come from news coverage of the incident, and Trial Counsel had "a lot of doubt" concerning Mr. Buckler's testimony. Trial Counsel stated that testimony at the petitioner's trial established that the petitioner had bought a shotgun and shotgun shells less than a week before the shooting. He further stated that someone testified that the petitioner "came to his residence after the shooting and described what occurred and asked him to hold something ...." Trial Counsel testified that before trial, he and General Young reviewed their files, and General Young gave him any documents that he did not have. He further testified that he was on notice that the state was alleging that the petitioner used a sawed-off shotgun and that they were pursuing a theory of premeditated murder.

Trial Counsel said that a tornado hit the area a couple days after the shooting, and it overshadowed the incident in the media. He was not aware of any pre-trial media attention and did not see the need for a change of venue. Trial Counsel stated that he advised the petitioner not to testify at his trial because the petitioner's testimony and the testimony of the alibi witnesses would have placed the petitioner at the scene of the shooting when it happened. In addition, the petitioner's potential testimony varied from his previous statements. According to Trial Counsel, after he gave the petitioner advice about whether to testify, the petitioner decided not to testify. When asked why he did not object to the trial court's aggravated assault lesser included offense instruction, Trial Counsel responded, "Actually, I thought it was ... awesome to get that instruction considering the evidence that was presented."

* * *

Based on the military base's recommendation, Ms. McClanahan retained Trial Counsel to represent the petitioner. Ms. McClanahan spoke with Trial Counsel multiple times before she retained him, and she communicated with him, primarily via email, several times before the petitioner's trial. Ms. McClanahan testified that Pre-Trial Counsel told her about a settlement offer from the state that would drop the petitioner's charges down to aggravated assault. When the petitioner retained Trial Counsel, Ms. McClanahan asked him about the offer, and he told her that "he would look into it, but he didn't have any knowledge of [it]."

Ms. McClanahan recalled visiting the petitioner in jail before his trial. During her visit she cried and begged the petitioner not to testify. She stated that the

16

petitioner was adamant about testifying, and Trial Counsel was adamant about the petitioner not testifying. She further stated that Trial Counsel told her that testifying would not be beneficial for the petitioner, and he asked her to convince the petitioner to listen to him.

Ms. McClanahan stated that during the trial, the petitioner was still adamant about testifying in his own defense. After the state closed its proof, Trial Counsel spoke with Ms. McClanahan and Ms. Carolyn Comer, a family friend. Trial Counsel told Ms. McClanahan that the petitioner was "a little upset" because Trial Counsel did not want him to testify.

Trial Counsel further told Ms. McClanahan that the petitioner would get sentenced to more time if he testified. At Trial Counsel's request, Ms. McClanahan wrote the petitioner a note and told him to "just do what your lawyer says." Ms. McClanahan said that the petitioner waived his right to testify. She stated that when the petitioner was advising the court that he wanted to waive his right to testify, "he looked down, kind of like submission...."

After the trial, Ms. McClanahan and Ms. Comer met with Trial Counsel and his assistant, Ms. Dagmar. According to Ms. McClanahan, during this meeting Trial Counsel informed her that the petitioner should file a claim for "inadequate counsel ... because during the time, [Trial Counsel and the petitioner] had meetings ... [Trial Counsel] was having some personal issues ... [and] there [were] a couple of meetings that he had to bow out on[.]" Ms. McClanahan testified that Trial Counsel said he would not contest the claim and would even testify if needed.

Ms. McClanahan stated that she discovered information about a pharmaceutical product that the petitioner had taken. She printed an article from a website and gave it to Post-Conviction Counsel. Ms. McClanahan said that during the summer and fall of 1998, the petitioner was in Panama. When he returned, he had "mood swings, irritation, [and] it seemed like he had trouble sleeping...."

On cross-examination, Ms. McClanahan agreed that the petitioner's first lawyer "made it perfectly clear to [her]" that the state made a settlement offer to the petitioner. She asked the lawyer why the petitioner would need to settle if he did not do anything, and he advised her to talk to the petitioner about the offer. Ms. McClanahan said that when she spoke to the petitioner about the offer, "he didn't know what [she] was talking about." She testified that from the lawyer's phone call, it was clear that the lawyer believed he had told the petitioner about the offer.

Id. at *4, 5-6, 7-8 (emphasis added).

To evaluate these claims, the Petitioner bears the burden of establishing his claim of ineffective assistance of counsel beyond a preponderance of the evidence. Strickland v. Washington, 466 U.S. 668, 695-96 (1984). To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate:

> First, . . . that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial. a trial whose result is reliable.

Id. at 687.

The standard for reviewing an attorney's performance is that of a reasonably effective counsel considering all of the circumstances. Id. at 688. Accordingly, "[j]udicial scrutiny of counsel's performance must be highly deferential," for "it is all too easy for a court, examining counsel's [performance] . . . after it has proved unsuccessful, to conclude that a particular act or mission of counsel was unreasonable." Id. at 689. The "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. This is particularly true for tactical or strategic decisions. Id. at 690-91. To prove prejudice, defendant "must show a reasonable probability that, but for his attorney's errors, the proceedings would have produced a different result." Ross v. United States, 339 F.3d 483, 492 (6th Cir. 2003); see also Olden v. United States, 224 F.3d 561, 565 (6th Cir. 2000).

To establish that his counsel's performance was deficient under Strickland, a movant "must identify acts that were 'outside the wide range of professionally competent assistance.'" Smith v. United States, 348 F.3d 545, 551 (6th Cir. 2003) (quoting Strickland, 466 U.S. at 690). In evaluating whether a Movant's counsel satisfied the Sixth Amendment standards, "[i]t will

generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986), (quoting Strickland, 466 U.S. at 689).

Given the Court's conclusion that the state courts' rulings on Petitioner's indictment claim were reasonable and consistent with federal law, the Court concludes that Petitioner cannot establish any prejudice for his trial counsel's failure to challenge that indictment.

For these reasons, the Court concludes that Petitioner's motion for summary judgment (Docket Entry No. 30) should be denied and this action should be dismissed with prejudice.

An appropriate Order is filed herewith.

ENTERED this the 26th day of October, 2011.

William J. Haynes, Jr.
United States District Judge